IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JESUS FIDEL MORALES, )<br>)<br>)<br>Petitioner, )<br>v. )<br>)<br>ALAN UCHTMAN, )<br>)<br>Respondent. ) | Case No. 05 C 6578<br><br>Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Jesus Fidel Morales ("Morales" or "Petitioner") was convicted of murder for the January 16, 1995 shooting death of Kedric Bell ("Bell") in Chicago, Illinois. Before this Court is Morales's petition for writ of habeas corpus under 28 U.S.C. § 2254. Morales's habeas petition states the following five claims: (1) that Morales was denied his Sixth Amendment right to the effective assistance of counsel when the trial court failed to inquire adequately into his counsel's potential conflict of interest; (2) that Morales was denied his Sixth Amendment right to the effective assistance of counsel because his counsel operated under an actual conflict of interest that adversely affected his performance; (3) that Morales was denied his Fifth Amendment rights when the trial court denied a motion to suppress his confession, which was rendered involuntary by sleep deprivation, inadequate nutrition, improper treatment of Morales's diabetes, and Morales's limited command of the English language; (4) that Morales was denied his Fifth, Sixth and Fourteenth Amendment rights when the trial court improperly restricted cross-examination of certain witnesses; and (5) that Morales was denied his Sixth and Fourteenth Amendment rights when the trial court improperly restricted voir dire of potential jurors. For the reasons set forth below, the petition is denied.

The Murder

During 1994, Morales distributed cocaine in Chicago and other cities in the Midwest. Jorge Hernandez ("Hernandez") was Morales's superior in the drug distribution organization. Hernandez obtained cocaine from Columbia and then supplied it to Morales.

In early 2005, Morales owed Hernandez approximately $200,000 for drugs previously supplied and was unable to pay the debt. Hernandez threatened Morales and sent a "courier" to Chicago to collect from Morales. Morales was able to negotiate an extension of time to pay the debt and the courier left.

Morales and an associate, Alexis Paredero ("Paredero"), then began planning to kill Hernandez's next courier. Morales planned to make it look as though he had paid the courier but that the courier had later become the victim of a random robbery by gang members. Paredero paid a gang member, Malcolm Ortiz ("Ortiz"), $10,000 for his agreement to commit the murder.

In January of 1995, Hernandez sent Bell to Chicago to collect from Morales. On January 15, 1995, Paredero set up a meeting between Morales and Ortiz, during which they agreed on the details of the killing. Later that evening, Paredero picked up Bell, who had been advised that he would receive payment for Morales's debt. Instead, Paredero took Bell to the site of the murder, where Ortiz and an associate – posing as police officers – shot him to death.

---

[1]Factual findings of state courts are presumed correct in a federal habeas proceeding unless the petitioner rebuts the presumption with clear and convincing evidence. *Abrams v. Barnett*, 121 F.3d 1036, 1038 (7th Cir. 1997) (citing 28 U.S.C. § 2254). Petitioner has not directed this Court to any such evidence. Accordingly, the facts presented herein are taken from the decisions of the Illinois Appellate Court and the Illinois Supreme Court, filed in this case as Respondent's Exhibits A and B.

<u>The Trial</u>

Morales's attorney, Michael Blacker ("Blacker") of Miami, defended Morales at trial while simultaneously representing Hernandez in connection with federal drug charges in Florida. During a pretrial hearing on Morales's motion to suppress, Assistant State's Attorney David Kelley ("Kelley") advised the court that Blacker was also representing Hernandez, who was a potential witness for the State. While Blacker remained silent, Kelley explained the potential conflict of interest to the trial court as follows:

> Judge, the other matter is something I want to put on the record. I have talked to Mr. Blacker about this earlier, and basically it involves Mr. Blacker's representation of a person by the name of George [sic] Hernandez.

> So this Court is aware of this situation, Mr. Hernandez is someone who is somewhat related to this case, who could potentially be a witness for the State in its case in chief, and even more likely perhaps in aggravation if this case would proceed to a jury or your honor for a death penalty sentencing.

> Mr. Hernandez, it's my understanding after talking to federal authorities in Miami, he's currently in custody under federal drug charges, will shortly possibly, it's not firmly cemented, but very likely will enter a plea to federal charges that would involve his agreement to cooperate with federal authorities, and after having talked with federal authorities myself and possibly testifying in several matters.

> Mr. Blacker represents Mr. Hernandez in front of the federal government down in Miami, and I wanted to put on the record so Mr. Morales knows that Mr. Blacker, and I believe he already does, represents Mr. Hernandez and that there would be a possibility of a potential at least for conflict if the State does at some point attempt to call Mr. Hernandez regarding matters against Mr. Morales's interest. So, therefore, I wanted to put the Court on notice and put Mr. Morales on notice in open court so that he knows what our motion is and then basically find out if he still wants Mr. Blacker to represent him, understanding what the possible conflict is. And if he does and it's his desire to have Mr. Blacker represent him, then that's fine, but I just wanted to put that on the record.

(Brief of Plaintiff-Appellee, People of the State of Illinois, No. 99-0033, on file as Exh. D to Respondent's Answer to the Petition) (citing Supp. R. June 23, 1997, at 13-14).

After Kelley apprised the court of the potential conflict of interest stemming from Blacker's simultaneous representation of Morales and Hernandez, the court engaged Morales in the following three-question colloquy:

> THE COURT: Mr. Morales, do you understand what the assistant [S]tate's attorney has just stated?
> THE DEFENDANT: Yes.
> THE COURT: Knowing of the possible conflict in regard to your attorney representing Mr. Hernandez, do you understand that?
> THE DEFENDANT: Yes, Sir.
> THE COURT: Knowing that, do you still wish for your attorney, Mr. Blacker, to represent you in this matter?
> THE DEFENDANT: Yes, Sir.
> THE COURT: Call your first witness.

*People v. Morales*, 329 Ill. App. 3d 97, 109 (Ill. App. Ct. 2002) (on file as Exh. B to Respondent's Answer to the Petition); (Brief for Defendant-Appellant in *People v. Morales*, No. 1-99-0033, on file as Exh. C. to Respondent's Answer to the Petition).

Hernandez did not testify at Morales's trial. However, a letter written by Hernandez to a purported member of a Columbian drug cartel (the "Hernandez Letter") was introduced during the sentencing phase of Morales's trial. In the Hernandez Letter, Hernandez stated that Morales and another individual, Olga Medina, were to take over Hernandez's drug business while Hernandez was in prison. The Hernandez Letter asked that the Columbians deal with Morales just as they had dealt with Hernandez. Blacker attempted to discredit the Hernandez Letter by introducing evidence that Hernandez was mentally unstable.

Blacker also had a connection to another State's witness, Roger Ross ("Ross"), who did testify at Morales's trial. Before the trial, Blacker had consulted with Ross about the possibility of representing him on appeal from the denial of Ross's motion to suppress. Ross, who had been

convicted on drug charges, was Bell's cousin and an associate of Hernandez. The evidence Ross had moved to suppress led to his arrest and to Hernandez's arrest, as well as to Ross's conviction.

At Morales's trial, Ross testified that Hernandez sent Bell to Chicago. He testified further that, after he learned that Bell had been shot, he called Hernandez, who gave him Morales's phone number. Before Ross testified, Blacker informed the trial court that he had "probably been privy to confidential information" while consulting with Ross about the possibility of representing Ross in connection with his appeal. *People v. Morales*, 209 Ill.2d 350 (2004). The trial court ruled that Blacker could not cross-examine Ross about the facts and circumstances behind Ross's arrest and conviction.

### PROCEDURAL BACKGROUND

Morales was convicted of first degree murder, solicitation to commit murder for hire and conspiracy to commit murder in connection with Bell's death. Though Morales was found eligible for the death penalty, the trial court found mitigating factors to preclude the imposition of that penalty and instead sentenced Morales to natural life imprisonment without possibility of parole. Morales appealed his conviction, arguing, *inter alia*, that his confession was not voluntary and that a conflict of interest had deprived him of his right to the effective assistance of his trial counsel. The Illinois Appellate Court, First District, reversed and remanded for a new trial on the ground that defense counsel labored under a *per se* conflict of interest that Morales did not waive.[2]

The State filed a petition for leave to appeal to the Illinois Supreme Court, which was

---

[2] Under Illinois law, a *per se* conflict is "one in which 'facts about a defense attorney's status . . . engender, *by themselves*, a disabling conflict.'" *People v. Morales*, 209 Ill.2d 340, 346 (2004) (citing *People v. Spreitzer*, 123 Ill.2d 1, 14 (1988) (emphasis in original). A *per se* conflict is grounds for reversal of a conviction unless the defendant waived the right to conflict-free counsel. *Id.* at 345 (citing *Spreitzer*, 123 Ill.2d at 17).

granted. The Illinois Supreme Court reversed the judgment of the appellate court, holding that Blacker's simultaneous representation of Morales and Hernandez did not constitute either a *per se* conflict or an actual conflict of interest that adversely affected Blacker's performance. The Illinois Supreme Court remanded to the appellate court for consideration of certain of Morales's arguments that the appellate court had not addressed in light of the fact that it had ordered a new trial upon finding a *per se* conflict.

On remand, the Illinois Appellate Court issued a Supplemental Order affirming Morales's conviction and holding that: (1) Morales had not been denied the effective assistance of counsel; (2) the trial court did not err in restricting Blacker's cross examination of certain witnesses; and (3) Morales had waived his argument that the jury had not been improperly sworn because he did not object at trial or raise the issue in his post-trial motion. Morales sought leave to appeal the Supplemental Order to the Illinois Supreme Court. In his petition for leave to appeal, Morales argued that the appellate court erred in holding that he failed to demonstrate deficient performance by Blacker, who referred to Morales as a "scum bag" in both opening statement and closing argument. Morales further argued that the appellate court erred in finding that he had waived his claim regarding a statement Blacker made in chambers against Morales's interests and renewed his argument that his confession was not voluntary. The Illinois Supreme Court denied leave to appeal on November 24, 2004.

Morales also filed a petition for postconviction relief in the Circuit Court of Cook County on October 26, 2001. That petition argued that: (1) Morales was denied the right to a fair trial by the introduction of "substantial other bad acts evidence;" (2) the evidence was insufficient to prove Morales's guilt beyond a reasonable doubt; (3) the State offered perjured testimony against Morales;

6

(4) the prosecutor improperly vouched for several witnesses; and (5) Morales's appellate counsel was ineffective. Morales also accused the trial judge of having been biased against him and his counsel. The circuit court dismissed the petition on January 10, 2002.

Morales appealed the dismissal of his petition for postconviction relief to the Illinois Appellate Court. On September 30, 2004, the Illinois Appellate Court affirmed the judgment of the circuit court with respect to the dismissal of the petition for postconviction relief. Morales then sought leave to appeal the denial of postconviction relief to the Illinois Supreme Court. Morales argued therein that his argument regarding ineffective assistance of appellate counsel was not meritless or barred by *res judicata*. The Illinois Supreme Court denied leave to appeal on January 26, 2005.

## STANDARDS

### I.  Habeas Standard.

A federal court may issue a writ of habeas corpus only if the state court reached a decision that was either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. *Raygoza v. Hulick*, 474 F.3d 958, 963 (7th Cir. 2007) (citing *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000)). In *Williams*, the Supreme Court explained that a state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams*, 529 U.S. at 405. In order to demonstrate that a state court decision is an "unreasonable application" of federal law, a habeas petitioner must demonstrate that a state court has unreasonably applied the controlling law to the facts of the case. *Id.* at 407.

7

This requires more than a demonstration that the state court has reached a decision that is substantively incorrect; instead, a writ may be granted only when the state court decision is "objectively unreasonable." *Walker v. Litscher*, 421 F.3d 549, 554 (7th Cir. 2005). An objectively unreasonable decision is one "lying well outside the boundaries of permissible differences of opinion." *Raygoza*, 474 F.3d at 963 (quoting *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002)).

## II.    Exhaustion and Procedural Default.

Before reaching the merits of Petitioner's claim, this Court must determine whether he has exhausted all remedies available to him in state court. *Guest v. McCann*, 474 F.3d 926, 929-30 (7th Cir. 2007) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-46 (1999) ("state prisoners must give the state courts one full opportunity to resolve constitutional issues by invoking one complete round of the State's established appellate review process."). "State remedies are exhausted when the petitioner does not have the 'right under the law of the State to raise, by any available procedure, the question presented.'" *Anderson v. Benik*, 471 F.3d 811, 814 (7th Cir. 2006) (citing 28 U.S.C. § 2254(c)). In Illinois, this means that a petitioner must have directly appealed to the Illinois Appellate Court and presented the claim in a petition for leave to appeal to the Illinois Supreme Court. *Guest*, 474 F.3d at 930 (citing *Boerckel*, 525 U.S. at 842-46).

"Exhaustion, however, must be distinguished from procedural default." *Anderson*, 471 F.3d at 814 (citing, *inter alia*, *Boerckel*, 525 U.S. at 850-51 (Stevens, J., dissenting) (providing a detailed explanation of the difference between exhaustion and procedural default)). To avoid procedural default, a petitioner must have fully and fairly presented his or her federal claims to the state court. *Id.* (citing *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004)). "In the state courts, the petitioner

must present both the operative facts and legal principles that control each of his claims." *Bintz v. Bertrand*, 403 F.3d 859, 863 (7th Cir. 2005) (citing *Rittenhouse v. Battles*, 263 F.3d 689, 695-96 (7th Cir. 2001)).   Fair presentment of a claim to a state court does not require "a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson*, 471 F.3d at 814-15 (citing *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001)).

If a petitioner has procedurally defaulted on a claim, he may obtain relief only upon a showing of cause and prejudice for the default or upon a showing that a failure to grant relief would work a fundamental miscarriage of justice. *Bintz*, 403 F.3d at 863 (citing *Moore v. Casperson*, 345 F.3d 474, 484 (7th Cir. 2004)).   Cause sufficient to excuse procedural default is ordinarily established by demonstrating that some impediment external to the defense prevented the petitioner from pursuing his constitutional claim in state court. *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004) (citing *Murray v. Carrier*, 477 U.S. 478, 488, 492 (1986)).   A petitioner may demonstrate a fundamental miscarriage of justice by establishing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.

## ANALYSIS

### I.   Morales's First Claim: Inadequate Inquiry Into His Counsel's Potential Conflict of Interest.

Morales's first claim is a "judicial inquiry" claim – that he was deprived of his Sixth Amendment right to the effective assistance of counsel because the trial judge, after the assistant State's Attorney advised the court of Blacker's potential conflict, failed to conduct an inquiry into the propriety of the multiple representation that was adequate to protect Morales's right to conflict-

free counsel. *See Holloway v. Arkansas*, 435 U.S. 475 (1978) (requiring automatic reversal of a conviction where defense counsel is required to represent co-defendants over his timely objection, unless trial court has determined there is no conflict). Respondent concedes that this claim is not procedurally defaulted. Accordingly, this Court will turn to the merits of this claim. *Perruquet*, 390 F.3d at 515 (noting that procedural default is a defense that the State is obligated to raise and preserve and, as with any other right or defense, the State will waive procedural default by intentionally relinquishing its right to assert that defense).

Morales is correct that after the assistant State's Attorney advised the trial judge that there was a potential conflict of interest stemming from Blacker's concurrent representation of Morales and Hernandez, the trial judge was obligated to inquire into the propriety of the multiple representation. *See Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980) (such an inquiry is not necessary "[u]nless the trial court knows or reasonably should know that a particular conflict exists"); *see also Mickens v. Taylor*, 535 U.S. 162, 168 (2002) (same). Morales contends that the trial judge's three-question inquiry into the propriety of the multiple representation was inadequate to ascertain whether Morales understood the nature of the conflict and whether he knowingly and intelligently waived the conflict. Morales argues that the trial judge's inadequate inquiry requires reversal of his conviction because it "violated Morales [sic] right to conflict free counsel." (Petition at p. 9).

The Illinois Supreme Court addressed this argument on the State's appeal and found that *Holloway's* rule of automatic reversal "applies only when a trial court fails to respond appropriately to *defense counsel's* objection to a representation." *People v. Morales*, 209 Ill.2d 340, 348 (2002) (citing *Mickens*, 535 U.S. at 168) (emphasis added). This conclusion was neither contrary to nor an unreasonable application of clearly established federal law. Indeed, Morales's position – that an

inadequate inquiry into the multiple representation, standing alone and without more, requires reversal of his conviction – is squarely contradicted by *Mickens*. In that case, the Supreme Court rejected the petitioner's argument that "where the trial judge neglects a duty to inquire into a potential conflict, the defendant, to obtain reversal of the judgment, need only show that his lawyer was subject to a conflict of interest, and need not show that the conflict adversely affected counsel's performance." 535 U.S. at 171. Instead, the Court held that when defense counsel has not objected to a simultaneous representation, a trial court's failure to inquire into a potential conflict will only void a conviction when the petitioner can also "establish that the conflict of interest adversely affected his counsel's performance." *Id.* at 174.

This Court agrees with Morales that the trial court could have and should have conducted a more thorough inquiry into the propriety of Blacker's simultaneous representation of Morales and Hernandez. However, *Mickens* stands for the proposition that in this case – because there was no objection to the simultaneous representation – Morales must demonstrate more than just an inadequate inquiry in order to obtain reversal of his conviction; he must also demonstrate that the conflict of interest adversely affected his counsel's performance. Accordingly, the Illinois Supreme Court's decision that *Holloway's* rule of automatic reversal did not apply in this case was neither contrary to nor an unreasonable application of clearly established federal law.

## II. Morales's Second Claim: An Actual Conflict Adversely Affected His Counsel's Performance.

### A. Procedural Default.

Morales sets forth several arguments in his second claim, two of which have not been through a full round of appellate review and are therefore procedurally defaulted. *Boerckel*, 526 U.S.

at 848. First, Morales argues that Blacker suffered from an actual conflict that adversely affected

his performance because he was prevented from calling Hernandez as a defense witness. Morales

raised this argument on direct appeal to the Illinois Appellate Court but did not present the issue to

the Illinois Supreme Court. Second, Morales argues that Blacker's conflict adversely affected his

performance inasmuch as it led him to discourage Morales from testifying in his own defense at trial.

Morales did not raise this issue on direct appeal to the Illinois Appellate Court, nor did he raise this

issue before the Illinois Supreme Court; instead, Morales raises this issue for the first time in his

habeas petition. As such, these claims are procedurally defaulted. Morales has neither alleged cause

for the default nor that failure to consider these arguments will work a fundamental miscarriage of

justice. *See Bintz*, 403 F.3d at 863. Accordingly, this Court cannot consider these portions of

Morales's second claim.

B.     Merits Determination.

Morales also argues that Blacker's conflict of interest adversely affected his performance

inasmuch as it caused other defects in strategy, tactics or decision-making, including: (1) that

Blacker was limited in his ability to cross-examine each witness who testified about Hernandez; (2)

that Blacker was limited in his ability to cross-examine the DEA agent who testified concerning a

letter Hernandez wrote which was introduced during Morales's sentencing hearing; and (3) that

Blacker was limited in his ability to cross-examine Ross because Blacker owed conflicting duties

to Ross. Respondent concedes that these claims are not procedurally defaulted. Accordingly, this

Court will address the merits of each argument.

The Illinois Supreme Court identified the proper standard for the evaluation of Morales's

Sixth Amendment claims: that a "Defendant may establish a violation of his right to effective

assistance of counsel by showing an actual conflict of interest that adversely affected his counsel's performance." *Morales*, 209 Ill.2d at 348-49 (citing *Sullivan*, 446 U.S. at 350). A petitioner demonstrates that an actual conflict had an adverse effect upon his lawyer's performance by showing that "there is a reasonable likelihood that his counsel's performance would have been different had there been no conflict of interest." *Hall v. United States*, 371 F.3d 969, 974 (7th Cir. 2004). In this case, the Illinois Supreme Court found that Morales had failed to demonstrate that Blacker's representation of Hernandez had any adverse effect upon his performance. As explained below, the decision of the Illinois Supreme Court in this regard was neither contrary to nor an unreasonable application of clearly established federal law.

With respect to the first of Morales's arguments that are not procedurally defaulted – that the conflict had an adverse effect upon Blacker's performance because it limited Blacker's ability to cross-examine witnesses who testified about Hernandez – the Illinois Supreme Court found that Morales had failed to "point to any specific defects in the cross-examination of any witness" and that "[his] bare allegation that Blacker's cross-examination was somehow affected is insufficient." *Morales*, 209 Ill.2d at 349. The Court identified two witnesses that testified that they knew Hernandez but found that "[i]t is not apparent from the record that Blacker's duties to Hernandez adversely affected his cross-examination of" those two witnesses. *Id.* With respect to other witnesses, the Court "fail[ed] to understand how Blacker's duties to Hernandez *could* have affected his cross-examination of the witnesses who could only testify about statements that the defendant made about Hernandez." *Id.* (emphasis in original). Nor is this Court able to divine how Blacker's performance on cross-examination would have been different had there been no conflict of interest. Accordingly, it was neither contrary to nor an unreasonable application of clearly established federal

law, as articulated in *Sullivan*, for the Illinois Supreme Court to conclude that Morales – by lodging the "bare allegation" that Blacker's cross-examinations were adversely affected in some unspecified way – had failed to establish that Blacker labored under an actual conflict that adversely affected his performance.

Morales also argues that Blacker's conflict of interest adversely affected his performance because it limited his ability to cross-examine the witness who introduced the Hernandez Letter at Morales's sentencing – an agent of the United States Drug Enforcement Agency ("DEA"). Addressing this argument, the Illinois Supreme Court found that Morales offered "nothing beyond the bare and legally insufficient claim that counsel's cross-examination was adversely affected in some unspecified way." *Morales*, 209 Ill.2d at 350. Morales has not explained in his habeas petition – and this Court is hard-pressed to understand – how Blacker's representation of Hernandez could possibly have affected his cross-examination of the DEA agent. Indeed, the suggestion that conflicting duties owed to Hernandez somehow limited Blacker's cross examination of the DEA agent who testified concerning the Hernandez Letter agent strikes this Court as particularly implausible given that Blacker attacked Hernandez's credibility *directly* after the Hernandez Letter was introduced at Morales's sentencing. *Id.* As with the witnesses who testified about Hernandez, it was neither contrary to nor an unreasonable application of clearly established federal law, as articulated in *Sullivan*, for the Illinois Supreme Court to conclude that the conflict did not adversely affect Blacker's performance with respect to the cross-examination of the DEA agent who testified concerning the Hernandez Letter.

Finally, Morales argues that the conflict adversely affected Blacker's performance because it limited his ability to cross-examine Ross. The Illinois Supreme Court found that Morales offered

only speculation as to "how cross-examination about the circumstances of Ross' arrest could possibly have been used to attack Ross' testimony." *Id.* at 351. In addition, that court found that the suggestion that Blacker's conflicting duties limited his cross-examination of Ross was contradicted by the record, which indicated that "the basis for [the trial court's limitation of Ross's cross-examination] was the State's objection that the material was irrelevant, not that Blacker had received confidences." *Id.* at 350. In other words, even if there had been no conflict of interest, the trial court would still have prevented inquiry into the circumstances of Ross's arrest on the grounds that the material was irrelevant. Accordingly, the Illinois Supreme Court found that Morales had not demonstrated that an actual conflict had adversely affected Blacker's performance with respect to the cross-examination of Ross. This Court finds no error in that conclusion. Given that the trial court limited the cross-examination of Ross on relevancy grounds and not because of any conflict, Morales cannot demonstrate that "there is a reasonable likelihood that his counsel's [cross-examination of Ross] would have been different had there been no conflict of interest." *Hall*, 371 F.3d at 974.

### III. Morales's Third Claim: His Confession Was Rendered Involuntary by Sleep Deprivation, Inadequate Nutrition, Improper Treatment of His Diabetes, and His Limited Command of the English Language.

#### A. Procedural Default.

In his third claim, Morales argues that his confession should have been suppressed because "[s]leep deprivation, improper insulin treatment, inadequate nutrition and limited ability to speak English made it impossible for Mr. Morales to knowingly waive his Fifth Amendment rights." (Petition at p. 12.) Morales raised this argument on direct appeal. The Illinois Appellate Court rejected this argument, holding, based upon the totality of the circumstances, that Morales's

confession was voluntary. *People v. Morales*, 329 Ill. App. 3d 97, 112-13 (Ill. Ct. App. 2002). Specifically, that court found that Morales spoke and understood English and had the benefit of an interpreter when he made his confession. *Id.* at 112. Further, Morales never complained about his physical condition except for one request for insulin, which was granted. *Id.* Instead, the Illinois Appellate Court ordered a new trial on the ground that Morales's counsel operated under a *per se* conflict of interest.

The State appealed that ruling to the Illinois Supreme Court. Though he could have done so, Morales did not raise any argument as to the voluntariness of his confession as an alternative ground for affirming the judgment of the Illinois Appellate Court in connection with the State's appeal to the Illinois Supreme Court. The Illinois Supreme Court ultimately reversed the judgment of the appellate court and remanded for consideration of other issues. The Illinois Appellate Court then affirmed Morales's conviction. Only in his *pro se* petition for leave to appeal *that* decision did Morales raise his arguments as to the voluntariness of his confession to the Illinois Supreme Court.

Respondent argues that Morales's failure to raise this claim in the State's appeal to the Illinois Supreme Court results in a procedural default. (Answer to Petition at p. 15-16) (citing *Boerckel*, 526 U.S. at 845 for the proposition that the "[failure] to raise this claim in one complete round of state court review" results in a procedural default). In Illinois, a petitioner exhausts a claim by directly appealing to the Illinois Appellate Court and presenting the claim in a petition for leave to appeal to the Illinois Supreme Court. *Guest*, 474 F.3d at 930 (citing *Boerckel*, 525 U.S. at 842-46). Morales presented this claim on direct appeal and presented the claim to the Illinois Supreme Court in a petition for leave to appeal, but he did not do so at the first available opportunity – in the State's appeal as an alternative ground for affirming the judgment of the Illinois Appellate Court.

Instead, Morales included this claim in a petition for leave to appeal from the Illinois Appellate Court's Supplemental Order on remand, which affirmed Morales's conviction. Respondent assumes that Morales's failure to present this argument to the Illinois Supreme Court at the first available opportunity results in a procedural default but does not present any authority in support of that proposition. Without deciding the question whether this claim is procedurally defaulted – as is permissible under 28 U.S.C. § 2254(b)(2) – this Court finds that Morales's third claim fails on the merits.

      B.    <u>Merits Determination.</u>

"In evaluating the voluntariness of a waiver or confession, a court must consider the totality of the circumstances." *Conner v. McBride*, 375 F.3d 643, 651 (7th Cir. 2004) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). A confession is not voluntary "*only* if circumstances demonstrate that police coercion or overreaching overbore the accused's will and caused the confession." *Id.* (citing *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (emphasis added)). In applying the totality test, the Seventh Circuit has identified a variety of factors a court may consider in order to assess voluntariness, including but not limited to: whether the defendant was read his *Miranda* rights; the defendant's age, intelligence and mental state; the interrogation conditions (i.e., duration, environment, access to restroom facilities and food); and the conduct of law enforcement officers (i.e., use of physical punishment). *Id.* (citations omitted).

In this case the Illinois Appellate Court evaluated the voluntariness of Morales's confession based on the totality of the circumstances and articulated the test of voluntariness as "whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." *People v. Morales*,

329 Ill. App. 3d at 111. The court noted that the resolution of Morales's motion to suppress his confession lasted over one and a half years and included the extensive testimony of many witnesses. *Id.* However, the court was "hampered" in its review of the voluntariness of Morales's confession because "the trial court failed to make any factual findings or credibility determinations." *Id.* Accordingly, the Illinois Appellate Court conducted a *de novo* review of the question of voluntariness. *Id.*

The Illinois Appellate Court rejected each of the bases upon which Morales asserted that his confession was not voluntary. First, the court rejected Morales's argument that his inability to speak English contributed to the involuntariness of his confession. *Id.* at 112. The court pointed to the testimony of "[s]everal police officers and Assistant State's Attorney Lyman . . . that [Morales] communicated in English for the majority of the interviews." *Id.* The court further noted that Morales had been "Mirandized" in both English and Spanish and that his entire confession was presented to Morales in Spanish. *Id.*

The court next turned to Morales's argument that his physical condition rendered his confession involuntary. The court determined that Morales was given food when he requested it and that Morales was taken to the hospital for insulin after he notified police officers that he would need medicine. *Id.* The court credited the testimony of police officers who indicated that "defendant stated that he felt fine, he never complained about his physical condition or asked for medical attention except for his one request for insulin, which was granted." *Id.* Further testimony indicated that "defendant never appeared tired or stated that he needed sleep." *Id.* The court recognized that the State's expert "diagnosed [Morales] as having . . . ketosis at Cook County Hospital" but found that there was "no evidence that [Morales] had this condition before 11:00 a.m. on March 22, nearly

5 hours after he signed his confession." *Id.* Accordingly, the Illinois Appellate Court found that Morales's confession was, based upon the totality of the circumstances, voluntary and that the trial court had properly denied his motion to suppress. *Id.* at 113.

This Court finds no fault with the decision of the Illinois Appellate Court. Though Morales did testify that "he did not know what [his confession] said and signed it only because [the police officers] told him that if he did, they would take him to the hospital," that testimony was contradicted by the testimony of the officers and of Assistant State's Attorney Lyman. *See id.* at 101. While there is room for disagreement with the Illinois Appellate Court as to which version of events to accept as true, its decision to credit the testimony of police officers and an Assistant State's Attorney and, in turn, to find that Morales's confession was voluntary was not contrary to clearly established federal law. Nor can the decision of the Illinois Appellate Court be characterized as objectively unreasonable for "lying well outside the boundaries of permissible differences of opinion." *Raygoza*, 474 F.3d at 963.

## IV. Morales's Fourth Claim: The Trial Court Unfairly Restricted Cross-Examination of Certain Witnesses.

In his fourth claim, Morales argues that the trial court unfairly restricted cross-examination of seven trial witnesses and of four additional witnesses at the hearing on the motion to suppress his confession in violation of Morales's Sixth Amendment Right. Morales raised this argument on direct appeal. With respect to the witnesses that testified at the hearing on Morales's motion to suppress, the court found "no error, individually or cumulatively, from the trial court's restriction on defendant's cross examination during the hearing on [the motion to suppress]." *People v. Morales*,

329 Ill. App. 3d at 113.[3]  Morales did not raise this claim regarding unfair restriction of cross-examinations either in the State's Appeal – as an alternative ground for affirming the judgment of the Appellate Court – or in a petition for leave to appeal to the Illinois Supreme Court.  As such, this claim is procedurally defaulted.  Morales has neither alleged cause for the default nor that failure to consider these arguments will work a fundamental miscarriage of justice.  *See Bintz*, 403 F.3d at 863.  Accordingly, this Court cannot consider Morales's fourth claim.

**V.      Morales's Fifth Claim: The Trial Court Improperly Restricted Voir Dire of Potential Jurors Over the Objection of Defense Counsel.**

In his fifth and final claim, Morales argues that the trial court improperly restricted voir dire of potential jurors.  Morales raised this argument on direct appeal and the Illinois Appellate Court found no error in the trial court's restriction of voir dire.  *People v. Morales*, 329 Ill. App. 3d at 113-114.  Like his fourth claim, Morales did not raise this claim regarding improper  restriction of voir dire either in the State's Appeal – as an alternative ground for affirming the judgment of the Appellate Court – or in a petition for leave to appeal to the Illinois Supreme Court.  As such, this claim is also procedurally defaulted.  Morales has neither alleged cause for the default nor that failure to consider these arguments will work a fundamental miscarriage of justice.  *See Bintz*, 403 F.3d at 863.  Accordingly, this Court cannot consider Morales's fifth claim.

**VI.     Morales Has Not and Cannot Demonstrate Cause and Prejudice or a Fundamental Miscarriage of Justice that Would Allow Him to Obtain Relief on His Procedurally Defaulted Claims.**

A habeas petitioner may only obtain relief on a procedurally defaulted claim if the petitioner can demonstrate either (a) cause for the default and prejudice; or (b) that failure to consider his claim

---

[3]The Court did not address the seven trial witnesses on Morales's direct appeal, though it did address those witnesses in its Supplemental Order on remand.  (Respondent Exh. I at p. 11-16).

would result in a fundamental miscarriage of justice – i.e., a claim of actual innocence. *Conner*, 375 F.3d at 648. In this case Morales has not demonstrated that any impediment prevented him from pursuing his constitutional claims in the Illinois state courts. Neither has Morales argued that the failure to consider his procedurally defaulted claims would leave an innocent man incarcerated. Nor could he. The Illinois Appellate Court found that the testimony at Morales's trial established the following:

> [Morales] lacked the money to pay Bell and asked Alexis Paredero to help him make it look like Bell had been paid and then robbed. Paredero told [Morales] that after they robbed Bell, they would kill him. The two men met with Malcolm Ortiz and Antonio Rosado, chose "snake alley" for the robbery , and decided that Paredero would drive Bell to the alley where Rosado and Ortiz would pretend to be police officers and arrest them. Paredero left [Morales] between 10:00 p.m. and 11:00 p.m. on January 15 after [Morales] paid him $10,000. [Morales] spent that night at his house with Medina, Luis Garcia and Armondo. The next morning, Hernandez called him and told him that Bell had been killed.
>
> Sergio Montero testified that . . . [Morales] told him that he owed Hernandez $500,000. Montero also overheard Ortiz and Rosado asking [Morales] for more money for the Chicago murder and [Morales] replying that he had already paid them.
>
> Debbie Perez, Paredero's wife, testified that . . . [Morales] told her that he was under pressure because he owed money to his distributor, Hernandez, and he feared for his and his family's lives. [Morales] stated that he would have to "deal with" the next person Hernandez sent to collect the money. When Paredero returned home early on January 16, 1995, Paredero told her that something went wrong, the guy was dead and mentioned that he, [Morales], Ortiz and Rosado were involved.
>
> * * *
>
> Paredero testified that . . . [Morales] stated that he would have to kill the next person who arrived to collect the money and asked Paredero if he knew anyone to help. Paredero contacted Ortiz who said he would to it for $10,000. On January 15, [Morales] seemed distraught and told Paredero that they were continually pressuring him and that he would have to kill Bell. [Morales] told Ortiz and Paredero that he wanted to make the murder look like a robbery and told them to take Bell's cell phone, pager and wallet. After [Morales] paid Ortiz, they decided to have Rosado and Ortiz act as police officers and kill Bell execution style, with a gunshot to the back of the head. [Morales] instructed Paredero to make sure Bell did not survive because if he did, "everybody [would be] dead."

*People v. Morales*, 329 Ill. App. 3d at 102-03.  Even as it reversed Morales's conviction and ordered a new trial, the Illinois Appellate Court found that a retrial would not violate double jeopardy principles because "[a]fter thoroughly reviewing the evidence, we are convinced that it was sufficient to support a finding of guilt beyond a reasonable doubt."  *Id.* at 110.  This Court agrees.  Accordingly, there is no risk that leaving Morales's procedurally defaulted claims unaddressed will result in a fundamental miscarriage of justice.

## CONCLUSION

For the reasons stated herein, the petition for writ of habeas corpus is denied.

So ordered.

Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:  March 29, 2007